Good morning again, and you may proceed. It's me again. I'm like that proverbial bad penny that keeps popping up. I think I can get by with this, at least with regard to Judge Benton and perhaps Judge Riley. You probably remember back in 1966 when the movie Bonnie and Clyde came out, it was overlooked for best picture, and Warren Beatty's famous comment that we was robbed. Well, that's how we felt. That's how Mr. Carey and I felt when we read the district court's opinion in this case. We felt like we'd been robbed. I don't know how carefully the court has looked at the pleadings or the documentary evidence in the pleadings, but I don't think I've ever seen a case where there's been better evidence of fraud. And unlike the, well, I guess to a certain extent the original source issue is important here, but far more important is this procedural problem that we have, and it is something this court needs to really focus on and really think about. Rule 26 is a rule that mandates that we disclose information in the intent to use that information. It applies equally to plaintiffs and to defendants. And it has a self-executing sanction in Rule 37 that says if you fail to disclose information or you fail to disclose the intended use of that information, you can't use that information. In that regard, it's a lot like the Enfield Fly Rule. The Enfield Fly Rule is designed to prevent the runner on first base from having a Hobson's choice between leaving first base and being called out or being thrown out in a double play. That's why you can't drop the ball and do that. It's the Enfield Fly Rule. Same thing with regard to Rule 37. Rule 37 is designed to prevent somebody from holding onto documents that it has an intention to use, keeping them secret, and then at the last minute, either at a hearing or at trial, coming in with these documents and saying, surprise, surprise, surprise. Do I understand what you're complaining about is getting unredacted copies when you wanted to get the redacted copies? That's not the normal claim. Your Honor, there are two issues. First, at the time that they went to the GSA and made a FOIA request to get the other FOIA request, they very clearly had an intention to use those documents. Now, when we made our discovery requests to the GSA, the GSA provided to both sets of attorneys the documents, most of which were unredacted. They provided a separate, separately identified and separately collated set of documents that was this supposed public disclosure, and they supplied that to the defendants only. And those documents, that collated set of documents, I mean, there would be no way for us to go through the documents that the GSA provided and pull out the ones that were in that FOIA request because they were not identified in the discovery as being in the FOIA request. Some of them had annotations on them, but none of them indicated that. And I guess that's my point. My point is, in this case, we had documents that we got from the GSA, but they never identified these documents in their Rule 26 disclosures, they never identified a FOIA request, and they never identified any intention to use that FOIA request. And then, at the close, at two days after all of the briefing in this case was closed, two days after that date, well outside the scheduling order, they filed a motion to dismiss. And if Rule 37 stands for anything, it should stand for the proposition that you don't get by with that. If you failed to disclose it, you can't use it to support your motion. And the plain text of Rule 37 says that. And if here's a situation that should bother the Court. There's also the work product rule in Rule 26. And I thought about your argument, and you're getting awfully close to saying you've got to telegraph to us how you're going to use this stuff. It doesn't say you have to telegraph how you have to use it. It says you have to say you have an intention to use it. And if the exclusion for work product applied, I would think there'd be a lot of cases already on that subject about why we didn't disclose this because we, you know, didn't want to violate our mental impressions. Well, I think what I'm trying to drive at is you definitely got it. You definitely got the materials. We got unredacted copies. And you had unredacted copies. And you're saying because you didn't see it the way it might be used against you, that's where I'm getting to the mental impressions and opinions and legal theories of the opponent. Because you didn't get it that way, the rule was violated. I don't know. You're on the edge there. And, Your Honor, with all due respect to you, and you know we miss you in Jefferson City, the fact of the matter is it was a separate set of documents that was separately collated. It had a separate identity and a separate intended use. They held this back. They sandbagged us. Now you take a different situation. I'm a plaintiff's lawyer and I have a product liability claim, right, against Ford Motor Company. NHTSA's got a bunch of documents and they're all public documents, right? I make a FOIA request and I get those documents, but I don't disclose them. And I say to the other side, hey, you could have made a FOIA request too. You could have gotten the same documents. And maybe, in fact, they already have those documents because they've contributed some of them to NHTSA or whatever. Are we going to craft an exception to Rule 26 that says if it's in the government's archives somewhere Rule 26 doesn't apply? How bad is that public policy? I mean, what you're doing is you're encouraging, what you're saying is we have rules and you have to play by the rules, but you don't have to play fair. That is not what the courts of the United States are about, I don't think. If we have rules, we ought to all play by the same rules and we ought to all have the same result. Explain to me how the late disclosure harmed you. Your Honor, if we had been told during the part of this case where discovery was open that they had this FOIA request, you wouldn't have had to have been the head cashier at Walmart to have figured out that they were going to use it as a public disclosure. In which case, we could then have gone to the people who received that FOIA request and said, what did you do with it? They rely a lot on the Schindler case and the factual differences between Schindler in this case are stark. In Schindler, the relator went to the Department of Labor, got a Freedom of Information Act request and used that to plead his case. Here we've got Trijan going and getting some information from the GSA. It's probably still in a file somewhere collecting dust or it's been in a shredder bin for years. One of the two. I'm not really sure which. But either way, we could have gone to them and we could have asked them, point blank, what did you do with this information? Did you share it? Did you ever make it public? Because I believe that the reason the court found a public disclosure in Schindler was because it was directly disclosed from the federal government to the relator. The relator had access to it. That's the note in Schindler where he talks about if the relator didn't have access to it or didn't use it, that maybe he has an argument that it wasn't used. And I think that that's pointed out in the briefing. I won't go into any further detail there. But certainly, we could have undertaken steps in discovery to find out exactly what happened with that. And we would have had much better arguments both before the district court and on appeal about whether or not this was, in fact, a public disclosure as that term is used in the False Claims Act. If a public disclosure, if any document requested by anyone anywhere from the federal government and Freedom of Information Act request is a public disclosure, that means that somebody in Springfield can request a public disclosure of information about a contract in California. And even though they never use it, a relator in California who tries to bring a case is going to be barred because there was a FOIA request. That makes no sense. So certainly, we had an opportunity and would have had an opportunity to put evidence into the record that showed that our relator had no access to that and that the documents, although they were a FOIA request that was delivered to Trigen, they were not, in fact, a public disclosure as that term is used and as it was decided in Schindler. And I think that's where we were prejudiced. To their credit, they don't make any attempt to excuse or justify the failure to disclose. Basically, what they say is we weren't prejudiced. But that's them telling me I'm not prejudiced when, in fact, I am. I should have had an opportunity to conduct discovery, particularly when that was a dispositive issue for the district court here. How am I not prejudiced if I don't get to delve into that information? Let me shift to a couple other things. First of all, I did not see it in your complaint. I don't think you're arguing now whether you're challenging the building life cycle costs. Are you using that theory? Is that still in the case? I believe that when the court issued its ruling with regard to public disclosure, that it took that out of the case. I don't think that has ever been a central theme, the building life cycle costs. I think we've relied much more heavily on the rate theory fraud and on the gratuities and graft issue. But if this court reversed, it would potentially be back in the case. Yes, Your Honor. On the rate, what is your argument on whether the public disclosures by KCPL was, they disclosed all the essential elements of the fraud? I'm not sure I understand your question, Your Honor. Do you believe, well, what's your argument that the disclosures that were made disclosed all the essential elements of the fraud? Well, I don't believe that it did disclose all the essential elements of the fraud. It disclosed- Why not? Because this case has two components. The first component is, we're going to give you a really good deal on your electric rate. And that is false, and it is acknowledged to be false. The second component is, all of these folks from GSA are going to get free tickets and on that end. And I don't believe that any of that was disclosed in the FOIA request. And I don't think the court actually ruled that the gratuities issue was taken out by the public disclosure. But I do think that it ruled that the fact of, that the rates were an issue was in that FOIA request. But it didn't, certainly it didn't disclose the fact that KCPNL promised a rate and had, you know, knew from the outset that it had absolutely no way to back that up. What I'm looking for is, I would assume your argument would be that public disclosures did not show that they had an intent to deceive, that they had, as Judge Benton was talking about, that there was some mental part. I think that's true. I mean, I'm looking for you to tell me what the elements are that you think were not disclosed. You know, my boss often says that in oral arguments, sometimes a judge is throwing you a life rope, and I appreciate that. That's exactly right. I do believe that the essential elements of the fraudulent nature of the transactions was not disclosed in the FOIA request. The only thing that was disclosed was KCPNL did a number of cost studies, gave them to the Federal Government. Trijan went out and tried to get a copy of that so they could reverse engineer and see if they could come up with a better analysis of the building life cycle costs. I'm sure that's why they tried to get the documents, but ultimately they wind up losing the contract, although they got it back when it became too expensive to operate these boilers. You know, the main reason that I do this kind of work is because I believe in the False Claims Act, and I believe that what we do as Relators Council is a valuable service. There are two $6 million paperweights sitting in the bottom of the Federal Building in Kansas City that we ought to get our money back on. And I don't believe that even if you took the FOIA requests and read through them page by page, which would be an arduous task, and I pity the clerk that would have to do that, there is not anything in there that lays out all of the essential elements that are pleaded in the complaint. And I'm not even sure that they're inferential, that you can infer from reading of all of that. So thank you, Your Honor. You made that argument much more eloquently than I did. Finally if I could just I'm not making arguments. You helped me. I'm trying to find out what your argument is on it. Well, and if I knew, Your Honor, I would certainly tell you. But sometimes, in spite of having prepared this case and lived with this case for the last two years, there are parts of it that just escape me because it is quite factually intensive and quite broad. Certainly with regard to the original source issue, our guy was an original source with regard to the gratuities. He was there. He was there at the ballgames. He saw it with his own eyes. He was an original source because he was right there in the building. He saw these devices be put in. He helped do some of the plumbing and some of the work on that. He asked questions and said, you know, why aren't we using these? And people disclosed to him that KCP&L had promised a rate and didn't give it. I'm into my rebuttal time, Your Honor. If I may, I'd like to sit down and let Mr. Graves go. Okay. Thank you, Mr. DeWitt. Thank you, Your Honor. Mr. Graves, good morning. Good morning. I will knock this off if this sits there. I'm sorry. I think it's up. May it please the court. I'm glad that Mr. DeWitt finished with or began with a outlaw theme because I have a similar theme. In this entire False Claims Act scenario, Congress has created a comprehensive scheme designed to reward certain whistleblowers for exposing certain types of fraud against the federal government. In Old West terms, Congress has posted a wanted dead or alive poster for information. But the law, the wanted poster, if you'll go with the analogy, is defined and limited. It does not offer a bounty to right just any wrong in the eyes of the bounty hunter. The case before the court today is an excellent example where the law just does not define a wanted poster. And that's what I think the public disclosure bar goes to. The public disclosure bar, in fact, excludes the two theories, the Bullying Life Cycle Cost Theory and the False Rate Theory. The lower court properly dismissed those. In addition, there were no fraudulent representations, and the district court was properly ruled on the summary judgment claim as to the gratuity theory. While it's thought still in my mind, what is your argument on the false rate promise theory with regard to whether the essential elements. I didn't see that the district court really individualized, made that assessment that there was full disclosure other than generally. What's your argument about whether all of the elements were publicly disclosed previously? Yes, your honor. The false rate promise theory is essentially Relater produced some documents that he claimed showed the fraud. And the key document among those was what he calls a Trigen Prophecy Letter. And the Trigen Letter is something that was disclosed in the FOIA disclosure. And it has all the elements that there was a rate claimed and that the rate could not be met. Trigen said all of those things ahead of time, which of course goes to another theory of defense that isn't before the court today. But what overlays this entire case is the fact that we have a filed rate doctrine that applies to public and private entities. Which means that anyone who deals with a public utility is presumed to know that the Missouri Public Service Commission sets the rates. We have no power to set the rates. And not only are they presumed to know that, they're presumed to know what the rate is. So against that backdrop, when the Trigen Prophecy Letter laid out that if we were claiming a different rate than was included in our tariff, that that was a false rate. Now we disagree that we knew that that rate was wrong. But assuming that everything the Relater says is right, that that was a false rate. That's all laid out in the Trigen Letter. In addition, in the FOIA disclosure, which is a public record that goes to public disclosure. There was a February 6, 2006, Building Life Cycle Cost Analysis that the GSA had done. There was a GSA email chain. And those email chains specifically said we are relying on the all electric rate into order to go to the electrode boilers. And so all the information, in fact, arguably if you look at the facts, much more information than the Relater had was disclosed by the documents that were contained in the FOIA release. And as to that FOIA release, Mr. DeWitt spent a fair amount of time on the 26E issue. And I'd like to briefly address that if I could. There's no apology by us for failing to disclose these documents, because we didn't fail to disclose these documents. Let's go to the Trigen Letter. Now that was issued considerable time, months after the KCPL's last publicly available so-called misrepresentation. And it does make comments about, may or may not be speculation, but it does not draw the, or suggest the inference that they were made intentionally or fraudulently. Now are you saying because you have to assume the KCPL knew the law that from the Trigen Letter you would say, well, you have to infer that, that again, I know you deny it, but you'd have to infer that they were saying that the KCPL intentionally and fraudulently was proposing these rates? In the backdrop against all this, Trigen was very bitter. And we're not only through the letter, but we're actively approaching the GSA and making statements. And the letter says that I think essentially if you read the letter, I don't know what they're offering you, but they're not capable of offering you that if it's not part of their tariff.  Trigen actually went to the PSC and got our tariff limited by intervening in a case where we could only, one of the central issues here is they went to PSC and limited to where we could only give it to existing customers. And the original interpretation of the PSC as to what existing customers were, were customers that were customers of Kansas City Power and Light. Then years later, they went back and got that limitation not only to existing customers, just before the boilers came online, but to the customers that weren't already all electric. So what I would submit is to the extent the Trigen letter does not explicitly say we were committing fraud, that if that is a failure of the Trigen letter to cover the bounds of this case, that's also a failure of the relator's proof because one of the only documents they had that they said made them an original source was the Trigen letter that the relator's father, who worked for the GSA, gave to him, and he had no additional information in addition to that other than the Trigen letter. Going back to the 26E disclosure, again, I think the court hit on this a little bit. But first of all, the standards is clear of prejudicial abuse of discretion. So it's a high standard, I think, on a matter such as this to overrule a district court judge. We also, we're not talking about 26 disclosures, we're talking about 26E disclosures, not the initial disclosures. And these documents had not only, they had already been disclosed, they'd been produced in their original form. And we had no need to tell them that we intended to use them because we did use them. We used them at a deposition of the GSA representative. During that deposition, the redactions and what the notations meant had been noted. The GSA witness testified about it. Council had opportunity to ask questions specifically about the FOIA issue. Asked some questions about the FOIA issues. They were marked as exhibits. So they were otherwise made known to the party in the process that there were FOIA documents. He knew about the content of the FOIA. There's nothing about the content of the FOIA that he did not know. In fact, he knew more than the redacted documents provided. He knew that they were produced to Lathrop and Gage under the October 2006 FOIA request. The response was in October 2007. And again, even if, for some reason, this redaction turns them into different documents. As a prejudicial matter, as a harmless error matter, they're still the same documents. And I would submit that if we could have, to our motion to dismiss, we could have attached those other documents instead of the redacted documents. They're so similar, but we did attach the redacted documents. But there was no effort to quote unquote sandbag anyone in this case. I think the court has pretty extensively covered the jurisdictional, not jurisdictional, pre-2010, not 2010. But one thing I'd like to add is if you look at the rule 12H3, which is subject matter jurisdiction rule. It says that if there is no subject matter jurisdiction, the court must dismiss. And that sounds very similar to me to the new standard in the law, which is shall dismiss. So it is a very similar imperative action on behalf of the court. And it's our position that the court very properly had subject matter jurisdiction before them. Mr. Grace, what then did Congress change when they changed the language? What did they change when they changed the language? They did remove the word jurisdiction from the language. Okay, but you say it didn't really change how you handle it? It didn't change how you handle it. And this whole, it's a novel argument to come up with the argument that we should have pled it and proved it as an affirmative defense, but in fact, in this case, one thing to note is it was pled. They pled in rule six that they were original source and that there had been no public information in this case. But that pleading on a whole separate issue doesn't even get past rule 9B. You can't just have a bare legal conclusion, you're the original source. We, in our response to six, we not only denied that they were the original source and denied that it was not based on public information, but we further offered an affirmative response, call it an affirmative defense if you want, but from a response that they did not have original information and they were not an original source. Nothing in this case that the defendant had was, or I'm sorry, the relator had. Nothing was original source material. He wasn't an original source. All the information he got from his father, he got from Scuttlebutt that he heard around the office. His very information was documents from the Trigen letter and things that he had heard. And again, he had to know one of two things. He either had to know that we had given them fraudulent information, or he had to know the true state of the facts. He didn't know the fraudulent information. His only evidence of the fraudulent information that he offered was essentially the Trigen letter, going back to Judge Riley's earlier question, and the only information that he had, the true state of the facts, was that the boilers were bad. But whether the boilers were good or the boilers were bad isn't even part of the allegations in the complaint. That's a completely separate issue. So the true state of the facts of whether the boilers work well or are being used doesn't even go to this particular case, Your Honor. What about the pleading standard? Did you hear my question earlier? That what we're dealing with here, it's got to be plausible. Have some scienter and sufficient facts to overcome the public disclosure bar. You think that's the standard for a relator here? I think that because it is a fraud pleading that has to have a little more than that. Specifically, in several of the cases, they've said that you have to have additional facts, and you can't just plead bare legal conclusions. So, Your Honor, I think that standard is right, but I think it goes a little further. I think more facts are required. So instead of the word scienter, you would say a lot of facts about fraud. A lot of facts about fraud about this important issues of fraud, which are one, that you knew ahead of time when you were saying something that it wasn't true. Two, that the other party did not know that it wasn't true. And three, that it actually resulted in some sort of damage to the other party. Do you think they have to plead facts to overcome the public disclosure bar in their initial pleading? I certainly think they have to plead facts that overcome the public disclosure bar, especially when we come forward with a converse pleading that specifically puts them on notice that we do not believe that they have pled sufficient facts. You believe in the scienter that Judge Ben is talking about, you also, the realtor has to plead that they had the intent to deceive? I think that's an important element of common law fraud, that you have the intent to deceive. And I think that would be something that needed to be pled. But on the gratuity theory, you just said that he was not an original source of anything. Is that your position as to that theory as well? Well, that would be our position, but that is not, that's not the ruling of the court. That particular- Right, right, I understand that's not the ruling. I was just, when you said that broadly, I didn't know if you were including that theory as well. Yeah, I guess, now Mr. Krachsberger, the relator, the son, did not work for the GSA, and he actually had tickets and used those tickets, I believe, that he used them. And so, I guess, as to tickets he had, he would have been an original source. He would come a lot closer on that issue than he would on the other issues. But again, as we go through in our pleadings, on the summary judgment claim, there is no false, there's no false information provided to the government. The gratuities theory and the ORCA theory. The ORCA theory is the, implements the Byrd Amendment, which says that you cannot use federal funds to lobby the federal government for a contract or for other reasons. You can use non-federal funds, which has been interpreted since the beginning of that amendment, to include even profits from federal contracts, but certainly, Kansas City Power and Light has funds from a much broader array of sources than the federal government. But that goes to lobbying. That does not go to gratuities. There's an entire separate- You can't bribe the GSA, right? Correct, you cannot bribe the GSA. And that's not a lobby issue. So it would be a fraudulent method of getting the contract. Excuse me, I'm sorry. It would be a fraudulent method of getting the contract. It wouldn't involve lobbying. If you bribe the GSA, would that be a fraudulent, again, going back to my first statement, there's very defined rules as to what the False Claim Act applies to.  I mean, one of them is a de minimis rule that applies. But that's a completely separate statutory scheme that has nothing to do with the ORCA scheme. And there is no certification, there's no certification out there, there's no representation to the government that you have not provided a gratuity to a- So you just don't think that that's a grounds at all under the False Claims Act? I don't think that's a ground under the False Claims Act.  Couldn't it be a cause? You know, if you had to think of gross bribery, you know, where they really bribe somebody. I mean, this is not gross bribery. But sure, that could fall under the False Claims Act. Well, there's- That makes the claim even beyond false. It's a bribed claim. I mean, I don't have a strong enough word for it. Well, the False Claims Act has a very specific meaning. But if there were a gross bribery, a cash payoff, there are other statutes that the federal government has at its disposal to use that. And one of them is, under the contract, in this very contract, one of the remedies was to, after notice and an opportunity to be heard, they could have canceled the contract if they decided to invoke that. That goes to the whole other issue, which is a materiality issue. But I think it was the, I'm not sure which case it was, but there's a case that said that where there's a complex scheme of remediation, which there is here for gratuities, that was not invoked, that it gives an indication as to materiality, as to how the government viewed materiality. And not only that, it actually shows the reason why the False Claims Act may not be necessary, because there's another way to address it. And there is. What we're worried about is the government making payments they're not supposed to make, right? That's not, your honor, all due respect, that's not what the False Claims Act is directed at. We've got a couple of cases that I'm quoting from a couple of our cases. This says a false certification is actionable under the False Claims Act, only if it leads the government to make a payment it would not otherwise make. But that's the key, your honor. There is no gratuity certification. There is no false representation to the government. That's not to say that no matter what happens, it's okay. But the statutory scheme is defined, and as to what one of the other arguments said, that is so that we do not have parasitic litigation that has nothing to do with, with remedying the wrong that the, that the government is targeting. You know, the, you, you've sort of alluded to this catch-all theory, which has, in the pleadings, is from, from our, from our viewpoint, is sort of faded in and faded out. If there is an ORCA certification, which there's not, it's faded in, faded out. But when you look at the catch-all theory, first of all, USXREL v. Costner, breach of contract is not enough for a catch-all theory. USXREL versus, USXREL vigil, the government's not concerned, the courts are not concerned with regulatory non-compliance, and although some things are perhaps remediable under the FCA, when there are complex contracts and that, and then there's not a certification, it simply does not reach it, the FCA does not. Again, the, the GSA had knowledge of this, there's evidence in the record that they had knowledge of this, and they chose not to invoke any of the remedial provisions at their disposal. There were, at the bottom line, as to the summary judgment, gratuities theory, there were no false statements, there were no false certifications to the government. And that's, that's what they're, they depend on. One thing that we didn't touch on very quickly was the, the 0.3 of the relator's brief, that this should have been turned into a 12D motion. Clearly, publicly available. Well, there are other documents that are embraced by the pleadings, and all the documents in this case, as we lay out in our brief, were, were public records and were properly considered by the court. Let's review, if there's anything I left off. Again, the, under the original source and the newel standard, the relator had no direct knowledge of the fraud. The relator had no direct knowledge of the true facts. And if this is, if the court decides this isn't a subject matter jurisdiction argument, if the court decides this is a 12B6 argument, the court certainly does not have to accept the bare legal conclusions in the pleadings in six, they can go beyond that in paragraph six. And rule 9B, in fact, requires more than just a bare legal conclusion that they were the original source. And no evidence has been offered that they were the original source. Again, to recap, the case before the court is an excellent example. Where when you go through the definition of what the law is directed to find and what the law is directed to remedy, that it just doesn't define that wanted poster. This case just doesn't fit. The public disclosure bar applies to the building life cycle cost theory. The public disclosure doctrine applies to the false rate theory. And moreover, there were no fraudulent representations under the gratuities theory, and summary judgment was appropriate. Thank you. Okay, thank you. Mr. DeWitt, I believe you have, again, almost five minutes. Thank you, your honor. After listening to Mr. Graves' argument, I'm reminded of the rather famous opening statement made by Joe Pesci and my cousin Vinnie, but I won't go there. I will simply point the court to a couple of things. First of all, he made reference to his answer. It wasn't filed until May 3rd, and it was filed essentially on the day that summary judgment motions were due. We had no information that they had any intent to use this. Also, the letter from the GSA to Mr. Graves' office with regard to this FOIA request specifically says that it includes the documents that were not previously disclosed by the GSA. So I think you can gather from that that there were documents in that FOIA request that were not provided during the original discovery, or by the discovery provided by the GSA. The other thing I want to make, you asked questions about intent, and the statute is very clear. You do not have to have an intent to defraud. This is a false claim statute. It's false or fraudulent. It can be either or. And I think Judge Benton, what you suggested about the three things you have to have, a plausible claim, all of that, I think that's absolutely accurate. I don't think that we necessarily have to address the public disclosure issue in the pleadings, although I always try to, I always try to put in there facts about how my relator discovered this information. I'm taking that from the wording, particularly the new statute, it says shall dismiss when there's a public disclosure. Right, but you wouldn't know that they're bringing a public disclosure unless they filed a motion. Yeah, but it's right in the statute, otherwise the court's supposed to dismiss it. Kind of a chicken and an egg problem, isn't it? Yes, exactly. Yeah. I don't know how the court will resolve that, but I know it will be just. One of the things that, I keep coming back to this, you have to disclose the intended use. You can't hold back on the fact that you intend to use these documents. That's what the rule says, and that's what most of the courts who have interpreted this have said. And I want to talk just a moment about the ORCA certification, because I think the ORCA certification is really important. KCPNL employees used gifts and other gratuities, and they gave them to the federal employees in an attempt to woo this contract. And whether you consider that lobbying or not, it certainly falls within the plain language of that ORCA certification. And that ORCA certification is a condition of the contract. Without certifying compliance with ORCA, you don't get this contract. Also, Mr. Graves made an interesting comment when he said that there's a provision in the contract that says you can be debarred or canceled. Basically, the government can cancel the contract. Well, first of all, that same provision also says that it exempts other remedies, that the government has full availability of all other remedies available to it. That's right in that FRD portion. Also, the language of the, this is kind of a layers of the onion case. In that, there were just so many things wrong. If you go through our summary judgment motion, and you look at the Bryant letter, where he basically guarantees they're going to get this right. If you look at the email chain later on, where they say, gosh, I can't believe we got by with this. I don't even know how we got this past them. I think there's enough that we should be able to get to a jury on this. And again, I'm passionate about this kind of work because I believe that somebody has to stand up for the taxpayer. The GSA is the client agency in this case, and the US government did not want to take this case forward. Even though they never found the Bryant letter, even though their investigation was perhaps a little deficient. I would point out, as the court probably can tell from the timeline, this case came out from underneath seal shortly after the little debacle in Las Vegas. So nobody at the GSA wanted this case to go much of anywhere, which sort of explains why the GSA provided a FOIA request to the other side and never told us about it after they told us that we wouldn't get any better access than the defendant got. So, the other thing I would suggest is that the filed rate doctrine is not really an issue in this case. I don't think that that was even briefed on appeal. But if it was, the filed rate doctrine does not apply, and that's because this is a false claims case. The final thing I wanted to talk about, if I could, is just the application of the original source in Rule 9B. Rule 9B applies to allegations of fraud. Original source allegations are not allegations of fraud. They're allegations of original source. Rule 8 applies, not Rule 9B. It would be false to assert otherwise. Thank you, your honor. I appreciate you listening to me twice in the same morning. I'm boring, even when I'm just the first guy. Thank you. Thank you. Well again, we thank you.